Torrance E. WILLIAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–92–00786–CR.

Court of Appeals of Texas, Houston (1st Dist.).

July 22, 1993.

Bruce Erratt, W. Tyler Moore, Jr., P.C., Bryan, for appellant.

Bill R. Turner, Eric D. Smith, Bryan, for appellee.

Before DUGGAN, MIRABAL and WILSON, JJ.

## OPINION

WILSON, Justice.

A jury convicted appellant of the offense of possession of less than 28 grams of cocaine. Appellant pled "true" to two enhancement paragraphs, and the trial court assessed punishment at 40–years confinement. In three points of error, appellant contends the evidence is insufficient to sustain his conviction and his trial counsel was ineffective. We reverse.

Appellant did not testify. State's witnesses testified that on October 19, 1991, at around 4:10 p.m., Bryan Police Officer Leroy Conerway received a call from the police dispatcher describing two persons who were allegedly involved in a narcotics transaction near the intersection of Martin Luther King and San Jacinto streets. Approximately 20 to 30 minutes later, Coner-

way and Officer DeAnne Coleman drove to the area in separate cars.

As Conerway and Coleman drove southwest on San Jacinto, they saw appellant, who matched one of the descriptions given to them, walking down Martin Luther King street.[1] Appellant looked at Conerway and began walking at a fast pace. No one else was near appellant when Conerway first saw him. Conerway drove up behind appellant and stopped his car. When appellant looked back, Conerway gestured for appellant to come back. Appellant began walking toward the patrol car, and Conerway told appellant he was making an investigative stop because he had information appellant was possibly selling narcotics. As Conerway stepped out of his car, appellant began running away from him toward the Lone Star Grocery.

Conerway lost sight of appellant momentarily after appellant ran behind the store. Conerway ran after appellant while Coleman drove around the block in an attempt to cut appellant off. Approximately 20 seconds later, Conerway saw appellant go behind a house and come out next to a tree. Coleman also saw appellant "pacing around" behind the house and walking near a large tree. She saw appellant walk toward a fence at the back end of the house and then walk toward Conerway.

Appellant came out towards Conerway with his hands up and proceeded to lie on the ground and pull objects out of his pockets. Conerway then placed appellant under arrest and instructed another officer to search behind the house. No contraband was confiscated from appellant's person. Conerway testified that appellant "didn't appear to have all of his mental faculties together" at the time he was arrested, and that he "had been drinking a little bit."

Lieutenant Freddie Komar found a matchbox laying on top of some grass and leaves next to a tree appellant had been near. Komar testified there was no debris on the matchbox and that it looked like it had not been there very long. Inside the

---

**1.** The dispatcher described one suspect as a black male wearing a white T-shirt with purple sleeves.

matchbox, Komar found what appeared to be two small rocks of crack cocaine and two shavings. One of the rocks fell out of the matchbox and was lost. The other rock and the shavings tested positive for cocaine.

In his first point of error, appellant contends the evidence is insufficient to support a finding that he possessed cocaine.

In determining the sufficiency of the evidence, the evidence is to be viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Chambers v. State,* 711 S.W.2d 240, 245 (Tex.Crim.App.1986); *Winter v. State,* 725 S.W.2d 728, 730 (Tex.App.—Houston [1st Dist.] 1986, no pet.).

 To prove unlawful possession of a controlled substance, the State must prove: (1) that appellant exercised care, custody, control, and management over the substance; and (2) that appellant knew the substance was contraband. *Winter,* 725 S.W.2d at 730. Possession describes the accused's relationship to the property. *Id.* Possession may be proved by circumstantial evidence. *Id.* However, in the absence of direct evidence, the circumstances must affirmatively link the defendant to the offense such that a reasonable inference arises that the accused knew of the contraband's existence and exercised control over it. *Id.* at 731.

 This Court set forth its own non-comprehensive list of potential affirmative links in possession cases in *Chavez v. State,* 769 S.W.2d 284, 288–89 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd) (citations omitted):

Circumstances the Texas Court of Criminal Appeals instructs us to consider ... include:

(1) Defendant's presence when the search warrant executed;

(2) Contraband in plain view;

(3) Defendant's proximity to and the accessibility of the narcotic;

(4) Defendant under the influence of narcotics when arrested;

(5) Defendant's possession of other contraband when arrested;

(6) Defendant's incriminating statements when arrested;

(7) Defendant's attempted flight;

(8) Defendant's furtive gestures;

(9) Presence of odor of the contraband;

(10) Presence of other contraband or drug paraphernalia, not included in the charge;

(11) Defendant's ownership or right to possession of the place where the controlled substance was found;

(12) Place drugs found was enclosed.

In the present case, testimony was presented that appellant matched the description given to the officers by the dispatcher about a suspect possibly engaged in a narcotics transaction. Appellant attempted to flee when Conerway told him he was investigating a narcotics transaction, appeared not to have full control of his mental faculties, and appeared to have been drinking. The cocaine was found in the same general area the officers observed appellant moving around. No other persons or packages were found in this area.

However, appellant was not found to be in personal possession or exercising control over the cocaine, and there was no evidence of furtive gestures toward the cocaine. Conerway testified this was a heavy drug traffic area and that other drug suspects had run this same way before. Appellant did not make any incriminating statements, and no contraband or drug paraphernalia was found on his person. Further, no testimony was presented describing what, if anything, appellant did when he was near the tree. There was no testimony, for example, that appellant hid behind the tree, dropped anything next to the tree, or made any suspicious or unusual movements while near the tree.

 Possession means more than being where the action is; it involves dominion and control over the thing allegedly possessed. *Humason v. State,* 699 S.W.2d 922, 923 (Tex.App.—Houston [1st Dist.] 1985), *aff'd,* 728 S.W.2d 363 (Tex.Crim.App. 1987). Affirmative links may be proved by

circumstantial evidence, but proof amounting only to strong suspicion or even probability will not suffice. *Humason,* 699 S.W.2d at 923. We find the evidence is insufficient to sustain a finding that appellant possessed cocaine beyond a reasonable doubt. *See id.* (evidence was not sufficient to show affirmative link where 3/100ths of a gram of cocaine was found in unzipped gym bag in vehicle defendant had been driving but it was not shown he owned the vehicle or the bag or was under the influence of any drugs or made any furtive gestures or incriminating statements).[2]

We sustain appellant's first point of error, reverse the conviction on the basis of insufficient evidence, and remand the cause to the trial court for entry of a judgment of acquittal. Therefore, it is unnecessary to consider appellant's remaining points of error.

MIRABAL, J., dissents.

MIRABAL, Justice, dissenting.

I dissent.

On appeal, after reviewing the same record, the majority and I have come to different conclusions. In my opinion, the evidence was sufficient to support the jury's finding of guilt. The jury was charged, in relevant part, as follows:

Now if you find from the evidence beyond a reasonable doubt that:

(a) on or about the nineteenth day of October, 1991,

(b) in Brazos County, Texas,

(c) Torrance Earl Williams

(d) did intentionally or knowingly

(e) possess

(f) a controlled substance, namely Cocaine, of less than 28 grams, including any adulterants or dilutants,

then you will find the defendant guilty of possession of a controlled substance as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

. . . .

The term "possession", as used herein, means actual care, custody, control or management of the controlled substance.

The jury found, beyond a reasonable doubt, that appellant was guilty as charged.

This Court may not sit as a thirteenth juror and disregard or reweigh the evidence. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). We must view the entire body of evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim. App.1989). The standard of review is the same for both direct and circumstantial evidence. *Geesa v. State,* 820 S.W.2d 154, 161 (Tex.Crim.App.1991); *Sutherlin v. State,* 682 S.W.2d 546, 548–49 (Tex.Crim. App.1984).

This is a circumstantial evidence case. Appellant defines the issue in this case as follows:

Appellant's case revolves around one issue: Was the appellant in possession of the cocaine found by Detective Komar on the 19th day of October, 1991? There was no direct evidence that appellant was ever in possession of the subject cocaine. The only objective test that could have tied the appellant to the cocaine, that being the test for finger prints, was negative.[1] The arresting officer did not testify that he saw the appellant in possession of the cocaine, nor did he testify that he saw the appellant throw down anything during the chase or arrest. Officer Coleman, the only officer who actually saw the appellant during the few moments he was behind the

---

**2.** We do not hold that the State must prove that someone actually saw the cocaine in appellant's possession. Rather, we merely find the circumstantial evidence in this case did not sufficiently link appellant to the cocaine, particularly given

that the cocaine was found in a place not owned by appellant nor under his exclusive control.

**1.** There were no identifiable fingerprints on the match box containing the cocaine.

house, did not testify that she saw the appellant throw down any object. ....

It is appellant's position that in the absence of direct evidence that he possessed the cocaine, such as testimony that someone *saw* appellant with the cocaine in his possession, he cannot be found guilty. I disagree.

The State called four witnesses to testify: three Bryan Police Department officers who were present at the scene of the arrest, and a DPS chemist. Appellant called no witnesses. Following are excerpts from the testimony heard by the jury.

### 1. Testimony of Officer Leroy Conerway, Sr.

Q. What happened on October 19th, 1991?

A. Well, on October 19, 1991, about 16:10 hours, which is 4:10 p.m. in the afternoon on that day, I was called by the dispatcher. Dispatch asked me to call them by phone, and they had a narcotics call....

A. I called the 911 dispatcher by phone.

Q. And what happened after that?

A. And she gave me a description of two people that the caller had identified and gave a description of those two callers—those two persons that the caller had described.

....

Q. You received a call from dispatch asking you to go to the area of MLK and San Jacinto?

A. Yes, sir. The Lone Star Grocery is in that area.

Q. And from your experience in dealing with the MLK–Lone Star Grocery Store area, is that a known narcotics area?

A. Yes, sir, it is.

Q. And what is the basis of your opinion?

A. The basis of my opinion, we've had many calls. We have seen activity which we know is drug related. We have had people killed in that area due to drug transactions that went bad, and we have personal knowledge that there is drug dealing there.

Q. So you received a narcotics call to go to this location for a possible narcotics transaction?

A. Yes, sir.

Q. And you had a description from dispatch of two individuals?

A. That's correct, sir.

....

Q. What happened when you arrived?

A. When I arrived, I was driving southwest on San Jacinto. I came up to the red light at Martin Luther King. I had to stop because of the red light. I looked to my left beginning to scan the area, and I did see one person in the area fitting the description of the caller.... This is where I first saw the defendant, Torrance Williams. I was looking to my left. He looked at me in the patrol car. Officer Coleman was directly behind me in her patrol car. He began walking at a fast pace. He was on Martin Luther Street, which is going back this way (indicating).

Q. So while you were at the intersection, you saw the defendant who matched the description?

A. Yes, sir, I did. I saw one of the persons that matched the description of the caller.

....

Q. Then what did you do next?

A. As the light turned green, there wasn't very much traffic on San Jacinto, so I immediately made a left turn and went down and drove up close behind the defendant, parked my car. He looked backed. I waved my arm for him to come back and talk with me. He made eye contact with me. He stopped. He was looking back, and he started walking towards the patrol car.

I began to exit—cut the motor off and began to exit the patrol car. I began to get my baton and lock the car. As I exited the car and began to close the door—well, I told the defendant that I needed to talk to him as he got close to the car because he was standing on the passenger side of the car right here (indicating).

. . . .

Q. Then what happened?

A. As he got to the passenger side of the car, as I was exiting, there was two other people standing there in close proximity, and they were talking back and forth. I don't know what the conversation was about. As I got out and closed the door, Mr. Williams began running in a westerly direction towards the Lone Star Grocery.

Q. Okay. Then what happened after Mr. Williams proceeded around Lone Star? He just broke and ran?

A. He just started running as fast as he could from my car back toward the store ... I lost sight of him as he went west at Lone Star Grocery.

Q. Okay. About how long did you lose sight of him?

A. About twenty seconds, I imagine, fifteen to twenty seconds.

Q. Okay. This all happened in a very short period of time?

A. Yes, sir.

Q. What did you do next?

A. As I proceeded through the blood-weeds, through the underbrush of the weed here, I heard Officer Coleman. She had parked on A Street here, and she was out of her car on foot, and apparently she heard me on the radio saying that he was running. She gets out of her car and goes down towards the dead end here, and she radios back to me, as I was making my way through the weeds here, that she had the defendant in sight, that he was somewhere in the area of this house here.

. . . .

Q. What happened next when Officer Coleman radioed you and she said had him in sight?

A. Well, I quickly began making my way through there knowing where he was at that time. So as fast as I could, I got through the weeds, and I could see the defendant moving about. He came from around the house, and he came out next to a tree, and then he disappeared again, and as I got closer, he was standing—he came out and was standing with his hands up. Then he began to walk towards me.

Q. You said he came by a tree?

A. He was close to a tree, yes, sir. I saw him behind the house at first when I was still in the grass, and I saw him disappear behind the house. Then I saw him—I didn't see him come back, but I saw him as he was—as I made my way clear, I saw him standing three or four feet east of the tree there which is close to the house.

Q. So around the tree somewhere around here?

A. Yes, sir.

Q. The defendant was darting back and forth here?

A. Yes, sir. He went behind the house. I saw him go behind the house, and I then didn't see him come back, but I did see him standing as I made my way clear close to the tree there in close proximity of the house.

Q. Okay. Then what happened? What happened when the defendant finally came around?

A. Well, he came around. He had his hands up. I told him to get on the ground, and he just kept walking with his hands up. As I got closer, he did get on the ground. I had my weapon drawn. He did get on the ground, and as he was on the ground, he was reaching into his pocket, and he pulling out some money and some cigarette lighters. He was pulling out everything he had in his pocket and putting it on the ground.

Q. Did you ask him to do that?

A. No, sir, I did not.

. . . .

Q. And then what did you do after you inventoried or picked up what the defendant had put on the ground?

A. Well, Lieutenant Komar was at my position at that time as I handcuffed him and got him up on his feet, got his property up, and I asked the Lieutenant if he would go behind the house and see what he could find back there.

Q. Why did you ask the Lieutenant to go behind the house?

A. Well, I had information that he was selling narcotics; number two, he ran from me, which aroused my suspicion; and number three, from my experience, I know that defendants do try to discard their narcotics because they know being arrested for a controlled substance is a felony offense.

Q. When Officer Komar—what was the condition of the defendant when you arrested him?

. . . .

A. I observed him to have pierce marks in his hand. It appeared that he was injured from trying to climb the top of the cyclone fence, which is about six feet tall. He was bleeding some.

Q. When Lieutenant Komar went behind the tree—that's where you first noticed the defendant; is that correct, at that area?

A. Yes, sir. Right, sir.

Q. What did Lieutenant Komar find?

A. He went back there, and he did find a match box back there. . . .

2. **Testimony of Officer DeAnne Coleman.**

Q. So were you immediately behind Officer Conerway?

A. He was at the light, and I was behind him.

. . . .

Q. What did you do then?

A. Okay. We were en route to the—we were on our way to the location where we were advised the subjects were, and so we were fixing to go in there. We were looking, you know, scanning the area for someone fitting the description.

Q. Did you see someone fitting the description?

A. Yes, I did.

Q. And who was that?

A. It was a Black male wearing a white T-shirt with purple sleeves on it.

Q. Is that defendant in court today?

A. Yes, he is.

Q. So what did you do after you saw the person fitting the description of the caller?

A. I saw the suspect—is how I refer to him. I saw him walking down the sidewalk kind of eastbound on MLK from the Lone Star Grocery area, and Officer Conerway was in front of me making his left turn from San Jacinto onto MLK. I was behind him, and he was in front of me. He went ahead and pulled up to stop to contact the suspect.

. . . .

Q. And what did you do when you heard the radio traffic that he was running?

A. I came around Officer Conerway's car and pulled up onto, as they have it, Little A. Street, which—

. . . .

Q. When you pulled up at Little A, what did you do—or Hudson Street?

A. Well, I knew at that time that Officer Conerway was chasing after the fellow, and so I immediately pulled up, you know, to get my car out of the road or whatever, and I took off after them. Well, I took off down the dirt road and was going to try and maybe block him off if he came—

. . . .

Q. Okay. So what did you do after you exited your vehicle?

A. When I left the vehicle, I was running down the little dirt street, and when I came to the end of the street—well, kind of like a dead end. The street takes a real sharp curve, but there's a fence there of the cemetery, and so I knew that—you know, I had checked through the cemetery, and I didn't see anybody running, so I ran towards San Jacinto in behind a house where I found another fence. I was kind of like blocked in. So I'm looking in there trying to find—see someone, and that's when I saw the suspect.

Q. You stated that happened—what's the length of time between all these transactions?

A. I would say at the most, twenty, twenty-five, maybe thirty seconds at the most. From whenever I heard the traffic of Officer Conerway in pursuit, you know, I hauled.

Q. So in about twenty to twenty-five seconds, you had the defendant in sight?

A. Yes.

Q. And what did you observe?

A. I observed him standing beside a white and black, kind of half-and-half painted house, and he was on the southwest corner of the house, and he was kind of pacing around, looking a little nervous, and I was thinking, you know, "He's trying to find a way out."

He also at one point walked over towards the fence, the cemetery fence, and he placed his hands on there, and then he walked back towards—he walked back behind the house, which is—I'm looking at the back end of the house.... I was watching him. He went over to the cemetery fence, and then he turned around. At that point, I believe Officer Conerway said something to him. I'm not really sure. And he started walking towards where I could hear Officer Conerway.

Q. So what did you do after Officer Conerway started talking to the defendant and had the defendant secured?

A. I came back around to help assist him, if he needed it, in taking the man into custody.

. . . .

Q. And after you walked him back to the patrol car, what did you do then?

A. Okay. At that time, my lieutenant, who was also in the area—once we, you know, logged in pursuit, he was over there by the area where I had seen the defendant back behind the house around by the fence and a large tree over there, and he had logged the recovery of found narcotics over there beside the large tree by the house.

. . . .

Q. Now, you stated that you thought you saw him trying to climb a fence?

A. I saw him go over to the fence. I was thinking he was maybe going to try and jump over the fence, but he did not.

Q. Was that area secured so that at the time the defendant was apprehended from the time that Lieutenant Komar and Officer Conerway and you also arrived that no one else could have been over there?

A. Yes. During the time, no one else did go over there.

Q. Did you go back and show Officer Komar where you saw the defendant?

A. Yes, I did.

Q. So you put yourself—

A. I advised him of where I saw the suspect. .

Q. And where was that?

A. He was walking around in the area. I saw him at one time on the corner of the house. I saw him walk nearby the tree in the area. They're close to each other. Then he walked over to the fence of the cemetery.

### 3. Testimony of Officer Freddie Komar.

Q. So what did you do when you arrived near the house?

A. I could see Officer Conerway was on top of a Black male. It looked like he had him under control. I went up to him and asked him if he needed any assistance.

Q. Then what did you do next?

A. Officer Conerway indicated it was taken care of. He asked me to go check the area. I believe he said the west side of the house or at least around the corner of the house....

A. I went around the corner of the house there.

Q. And when you went around the corner of the house, did you see anything or find anything?

A. Yes, sir. Toward the southwest corner, there's a pretty-good size tree. I looked around it, and maybe a foot away from the tree there was a match box, a normal, everyday match box laying on top of the grass and the leaves there.

Q. Was there any debris on this match box?

A. No, sir, there was not.

Q. Did it look like it had been there a long time?

A. I don't remember right now how it had been, but again, there were leaves on the ground. It was October. Trees were shedding. I think—I believe it had rained a couple of days before that, and to me, it looked like it had—it hadn't been out in the weather at all. It looked to me like it was there very recent.

The evidence speaks for itself. In my opinion, the evidence is sufficient to support the jury's finding, beyond a reasonable doubt, that appellant possessed the cocaine.

I would overrule point of error one, and address the remaining points of error.